MELINDA HAAG (CABN 132612)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

STACEY GEIS (CABN 181444)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7126
    Facsimile:  (415) 436-7234
    E-mail: stacey.geis@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 09-0414 SI |
|     Plaintiff, | ) ) | UNITED STATES' SENTENCING MEMORANDUM |
|         v. | ) ) | |
| MARK GUINN, | ) ) | Hearing Date: August 27, 2010 Time: 11:00 a.m. |
|     Defendant. | ) ) | |

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]

**TABLE OF CONTENTS**

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  Guidelines Calculation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.  6-level Enhancement for Continuous, Ongoing or Repetitive Discharge.. . . . . . . . . . . 3

        2.  4-Level Enhancement for Discharge Without a Permit.. . . . . . . . . . . . . . . . . . . . . . . 5

        3.  4-Level Enhancement for Role in the Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        4.  Decrease for Acceptance of Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.  Government's Sentencing Recommendation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 180 (D.N.J. 2009). . . . . . . . . 9

*United States v. Bogas*, 920 F.2d 363 (6th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Catucci*, 55 F.3d 15 (1st Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Chau*, 293 F.3d 96 (3d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Cooper*, , 173 F.3d 1192 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Cooper*, 482 F.3d 658 (4th Cir. 2007.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Dillon*, 351 F.3d 1315 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Eidson*, 108 F.3d 1336 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Fitzpatrick*, 127 F.3d 1100 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Goldfaden*, 987 F.2d 225 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Kelley Technical Coatings*, 157 F.3d 432 (6th Cir. 1998). . . . . . . . . . . . . . . . 6

*United States v. Lynn Moses,* (D. Idaho 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Ming Hong*, 242 F.3d 528, 533 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Perez*, 366 F.3d 1178 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Russo*, 281 F.App'x 43 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Schallom*, 998 F.2d 196 (4th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. St. Angelo*, 993 F.2d 229 (4th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Strandquist*, 993 F.2d 395 (4th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Technic Services, Inc.*, 314 F.3d 1031 (9th Cir. 2002). . . . . . . . . . . . . . . . . . 10

*United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Alexander Lapteff*, No. 03-CR-78. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Dand Van Dyke*, No. 03-CR-00033 (N.D. ind. 2003). . . . . . . . . . . . . . . . . . . 13

*United States v. Prime Plating*, No. 04-CR-208 (D.Minn. 2006). . . . . . . . . . . . . . . . . . . . . . . 14

///

///

| | |
|---|---|
| 1 | **FEDERAL STATUTES** |

2  33 U.S.C. § 1362(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3  U.S.S.G. § 2Q1.3(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4  U.S.S.G. § .3E1.1 App Note. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5  Clean Water Act, Title 18 U.S.C. § 37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

6  Clean Water Act, Title 33 U.S.C. § 1319(c)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                              iv

MELINDA HAAG (CABN 132612)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

STACEY GEIS (CABN 181444)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7126
    Facsimile:   (415) 436-7234
    E-mail: stacey.geis@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 09-0414 SI |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| MARK GUINN, | Hearing Date: August 27, 2010 |
| Defendant. | Time:              11:00 a.m. |

## I. INTRODUCTION

The defendant Mark Guinn ("Guinn") is scheduled to be sentenced before this Honorable Court on August 27, 2010. Guinn was convicted by a jury on May 11, 2010 of Counts One and Four of the Superseding Indictment, which alleged violations of the Clean Water Act, Title 33 U.S.C. § 1319(c)(2)(A) and conspiracy to violate the Clean Water Act, Title 18 U.S.C. § 371. The violations stemmed from the illegal discharge of pollutants into the Bay from 2003 through 2007 without a permit. The United States files this pleading to address the offense conduct, the Guidelines calculations, and advise the Court of the United States' sentencing recommendation.

//

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]

## II. DISCUSSION

### A. Offense Conduct

In the presentence report ("PSR"), the Probation Officer provides an accurate description of the offense conduct in this case. In brief, Guinn, who was the general manager of the Bay Area operations of Brusco Tug & Barge Inc. ("Brusco"), was convicted of conspiring to violate the Clean Water Act from April 2003 to January 2007 by discharging and conspiring with others to discharge toxic and/or contaminated dredged spoils, in large volumes, into waters surrounding Winter Island, all without a permit. He was also convicted of violating the Clean Water Act by ordering a Brusco captain to dump contaminated dredged spoils into the waters surrounding Winter Island on or about January 7, 2007. He was acquitted of Count 2 which involved violating the Clean Water Act on or about April 17, 2003 and the jury hung (10-2 to convict) on Count 3, which involved a Clean Water Act violation for a December 22, 2006 discharge.

### B. Guidelines Calculation

In this case, the United States agrees with the PSR's final calculation of the Sentencing Guidelines. The government agrees that the base offense level is 6. See U.S.S.G. § 2Q1.3(a). The government further agrees that there is a 6-level enhancement because the offense involved an ongoing, continuous, or repetitive discharge of a pollutant into the environment. See U.S.S.G. § 2Q1.3(b)(1)(A). The government agrees that there should be a 4-level enhancement for discharging without a permit or in violation of a permit. See U.S.S.G. § 2Q1.3(b)(4). The government further agrees that there should be a 4-level enhancement for Guinn's role in the offense as an organizer or leader in an activity involving five or more participants or was otherwise extensive. See U.S.S.G. § 3B1.1(a). Thus, under the government's and Probation's calculations, the adjusted offense level is 20. Because Guinn has a Criminal History Category of I, the applicable

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                 2

Guidelines range is 33-41 months in Zone D.[1]

### 1. 6-level Enhancement for Continuous, Ongoing or Repetitive Discharge

Probation has appropriately applied a 6-level enhancement because the offense involved an ongoing, continuous, or repetitive discharge of a pollutant into the environment. *See* U.S.S.G. § 2Q1.3(b)(1)(A). Because the government anticipates the defense arguing that this 6-level enhancement does not apply because there was no ongoing, continuous or repetitive discharge, the government wishes to brief the issue for the Court.

The government submits that the evidence at trial clearly demonstrated ongoing, continuous or repetitive discharges of a pollutant into the environment. Guinn was convicted of Count 1, conspiracy to violate the Clean Water Act from 2003 through 2007. Evidence showed that during this four year period, there were numerous instances of dumping both fully loaded barges (which equated to almost 1 million gallons of toxic spoils for a 5,000 cubic yard barge) and partially loaded barges. Witnesses testified to dumping numerous times (Dane Backman stated he himself dumped approximately 25 times, Brian Cosgrove stated he dumped 10-20 times, Jeff Hedlund stated he dumped at least 10-20 partial loads, and also admitted to dumping several full barges). Guinn himself admitted to SA Adair that he dumped barges himself more than once and stated that whenever Dutra was sending material to Winter Island, there was dumping. There was also testimony from Zachary Hedlund and Ken Black who each testified to dumping a full barge at least once, with Zachary testifying that he dumped both full and partial barges but could not recall how many.

///

---

[1] The government notes at ¶ 63, Probation stated the maximum fine for a Clean Water Act violation was $5,000 - $50,000/day. 33 U.S.C.§ 1319(c)(2)(4). Case law is clear that the maximum fine of $250,000/count listed under 18 U.S.C. § 3571 governs. *See United States v. Ming Hong*, 242 F.3d 528, 533 (4th Cir. 2001) (holding that because §1319(c)(1) of the CWA "does not specifically preclude application of §3571," the defendant was properly charged with the maximum possible fine authorized by §3571). The government did not notice this paragraph until the final draft was released and is not objecting to this paragraph because it is irrelevant for determining the appropriate fine.

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                3

The Guidelines are clear that if the offense involves <u>a</u> discharge, release, or emission, there is a 4-level increase and if the offense resulted in an ongoing, continuous, or repetitive discharge of a pollutant into the environment, then there is a 6-level increase. Here, there was clearly an ongoing, continuous or repetitive discharge based on evidence presented at trial. Case law not only supports this view, but has applied the 6-level increase based on facts with significantly less discharges. *See United States v. Cooper*, 173 F.3d 1192 (9th Cir. 1999)(finding 6-level enhancement justified for the dumping of 10,000 tons of sewage sludge over a period of time at an unauthorized location); *United States v. Eidson*, 108 F.3d 1336 (11th Cir. 1997) (upholding 6-level enhancement because there were two separate days of discharge); *United States v. Catucci*, 55 F.3d 15 (1st Cir. 1995)(finding 6-level enhancement applied where the dumping of PCBs occurred on two separate days); *United States v. Strandquist*, 993 F.2d 395 (4th Cir. 1993)(finding two separate discharges of sewage into the Chesapeake Bay constituted a repetitive offense).

For this enhancement to apply, there must also be a release into the environment. The defense has not contested this point. Evidence in this case was clear that the discharges were into the environment – here, directly into waters of the United States. The application note for this enhancement also notes that the discharge into the environment result in actual environmental contamination. The Ninth Circuit is clear, however, that the enhancement requires "actual environmental contamination," <u>not</u> proof of actual environmental harm. *United States v. Cooper*, 173 F.3d 1192 (9th Cir. 1999). Indeed, the enhancement may apply even though "[t]here may have been no actual harm." *United States v. Bogas*, 920 F.2d 363, 368 (6th Cir. 1990). Here, evidence showed that the dredged spoils were a pollutant as defined in the Clean Water Act (the actual definition of "pollutant" includes "dredged spoils." 33 U.S.C. § 1362(6)), that the dredged spoils were discharged directly into the environment, and that the dredged spoils were contaminated. From that evidence alone and any other evidence presented, the Court can conclude that there was actual contamination to the environment. *See Cooper*, 173 F.3d at 1205-06. Because there were

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                         4

numerous discharges, the 6-level enhancement applies.

**2. 4-Level Enhancement for Discharge Without a Permit.**

There should also be a 4-level enhancement for discharging without a permit or in violation of a permit. *See* U.S.S.G. § 2Q1.3(b)(4). The defense has stated to Probation that it believes including this enhancement could constitute double-counting because Guinn's base offense level was established in part on the lack of a permit being an element of the offense. In the alternative, the defense has stated that, should it apply, Probation should consider this potential double-counting as a basis for a sentence below the applicable Guideline range. Probation rejected this argument as should this Court.

Case law is clear that the 4-level enhancement applies to this type of offense conduct. *See e.g., United States v. Schallom*, 998 F.2d 196 (4th Cir. 1993) (finding 4-level enhancement applied in Clean Water Act case for discharge of a pollutant without a permit), *cert. denied*, 510 U.S. 902 (1993); *United States v. Goldfaden*, 987 F.2d 225 (5th Cir. 1993); *United States v. Cooper*, 173 F.3d 1192 (9th Cir. 1999) (even though defendant was not the one required to get a permit, the issue is whether the elements of the offense included violation of a permit, which it did, so enhancement applied); *United States v. Fitzpatrick*, 127 F.3d 1100 (4th Cir. 1997)(finding enhancement applied even though defendant argued that the permit requirement applied only to owners or operators of a CWA point source); *United States v. St. Angelo*, 993 F.2d 229 (4th Cir. 1993) (finding enhancement applied in RCRA hazardous waste case where defendant convicted of disposal without a permit, even though defendant argued he did not need a permit based on the specific volumes of waste).

There is also no "double counting" that occurs when you increase the offense level by 4 for discharging without a permit. *See United States v. Kelley Technical Coatings*, 157 F.3d 432 (6th Cir. 1998)(in finding no double counting, the Court found that Section 2Q1.2(a) provides the base level for a wide range of environmental offenses, therefore, the enhancement for discharging without a permit does not provide a second penalty for

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                                5

the same conduct). *See also United States v. Dillon*, 351 F.3d 1315 (10th Cir. 2003); *United States v. Perez*, 366 F.3d 1178 (11th Cir. 2004).

The defense may argue to the Court that, even if the enhancement applies, the Court should nonetheless factor in this apparent double-counting as an equitable reason to either depart down one or two levels (*see* § 2Q1.3 App. Note 7) or to issue a below Guideline sentence. It is the government's position that the facts of this case do not warrant a downward departure from the 4-level enhancement, and, if anything, given the volume of material dumped over the years (e.g., million of gallons of contaminated spoils), the location of the dumping (a highly sensitive estuary), the level of contamination (every load contained toxic and/or contaminated dredged spoils), and the knowledge on the part of Guinn and most everyone else who participated in the dumping that it was wrong and illegal, one could argue a departure upward is warranted.

### 3. 4-Level Enhancement for Role in the Offense

The government agrees with Probation that a 4-level enhancement is applicable given Guinn's role in the offense as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Guinn squarely fits into this category, as opposed to a manager or supervisor or some other role that would require only a 3-level increase.

To qualify as a leader or organizer, one must consider such factors as: (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activiy, and (7) the degree of control and authority exercised over others. *See* U.S.S.G. §3B1.1 App. Note 4. Guinn satisfies almost all of these criteria. Testimony at trial showed that Guinn was the sole instigator of this illegal activity. Indeed, Sean Derning testified that there was no dumping at Brusco until Guinn showed up as the manager. Jeff Hedlund also testified that when he arrived, Guinn was already the manager and the one who ordered him to dump. Every witness

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI] 6

1  who testified stated that they either dumped on direct orders from Guinn (e.g., Jeff
2  Hedlund, Brian Cosgrove, Ken Black), on orders that indirectly came from Guinn through
3  their captain (e.g., Dane Backman, Larry Barela, Corey Buckhalter), and/or that Guinn
4  knew about the dumping and never told them to stop (e.g., Zach Hedlund, Jeff Hedlund,
5  Brian Cosgrove).  Guinn also admitted that he dumped himself and ordered others to
6  dump.  Neither Guinn nor any other Brusco employee said they were ordered to dump by
7  someone higher up the chain of command at Brusco.  It all started and could have stopped
8  with Guinn.
9        The defense may argue that it was really Dutra who caused the dumping because
10 Guinn was feeling pressure to get barges back and was listening to what Dutra manager
11 J.C. Krause told him to do.  First of all, there can be more than one person who qualifies
12 as an organizer or leader, *see* § 3B1.1 App. Note 4, and one could argue that both J.C.
13 Krause and Guinn were organizers of this conspiracy to dump.  Second, this specific case
14 is about dumping that occurred at Brusco.  Guinn was the leader of this illegal conduct at
15 Brusco.  He was the Bay Area manager of Brusco.  Everyone reported to him.  He had the
16 sole decision making authority for the Bay Area operations.  Witnesses testified that they
17 did what Guinn ordered, including dumping, and that he never ordered them to stop
18 dumping.  Guinn both participated in dumping himself, by his own admission, but also
19 ordered others to do it.  He recruited accomplices and learned quickly who would join
20 him in the conspiracy and who would not.  For example, he asked Sean Derning once to
21 dump.  Derning refused and was never asked again.  Guinn called Scott Chamberlin in
22 April 2003 and ordered him to dump.  Chamberlin refused and Guinn went ahead and
23 arranged for someone else to dump a fully loaded large barge on the mooring near Winter
24 Island that same day.  Guinn never asked Chamberlin to dump again and even told Brian
25 Cosgrove not to dump when Chamberlin was around.  In sum, he used his power as a
26 manager to recruit accomplices where he could and avoided those who would not join the
27 conspiracy.
28       This abuse of power is particularly egregious.  Guinn continued to order

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                               7

employees to dump even when they complained it was wrong and should not be done. Jeff Hedlund testified that he told Guinn it was wrong to dump, but did it anyway because he had a huge debt to pay off and needed to keep his job. Larry Barela testified that after the first time he was told to dump, he told Guinn it was wrong and he did not want to do it. Guinn responded by sending him a fax on the boat stating that if he did not follow his orders, he could look for another job. Brian Cosgrove would tell Guinn it was wrong to dump. None of these employees wanted to dump, but felt they had to because it was on orders from Guinn – the boss of the Bay Area operations. Ken Black testified that in 2006, a Dutra captain dumped a barge he was towing near Winter Island. Black testified that he was upset and let the Dutra captain know that he was upset. He knew it was illegal, but being new to Brusco, he did not yet know the culture that Guinn had created – you do anything to keep Dutra happy. He learned quickly though. The next day, Black received a phone call from Guinn reprimanding him for criticizing a Dutra captain. Guinn then told Black he would not be getting further Dutra jobs. Black saw this as punishment given that Dutra was a main customer to Brusco. As a result, when Guinn called him months later in January 2007 and told him to take a barge up to Winter Island and dump it, he agreed to do it. He knew it was wrong, but he wanted to keep his job. To accomplish the illegal act, Guinn had Black call Jeff Hedlund who told him how and where to dump the barge.[2] This scenario shows not only the atmosphere Guinn created at Brusco, but it shows the extent to which Guinn was involved in the commission of these illegal acts.

    Guinn's role in this illegal conduct is exactly what the Guideline contemplated when they established a 4-level enhancement for a leader or organizer. *See e.g.*, *United States v. Atlantic States Cast Iron Pipe Co.,* 627 F. Supp. 180 (D.N.J. 2009)(upholding four level enhancement imposed in case involving conspiracy to violate the Clean Water

---

[2] Guinn told SA Adair that dumping occurred at Winter Island because of its remote location and the lack of GPS tracking on barges going to Winter Island.

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]     8

1  Act, Clean Air Act, and OSHA); *United States v. Technic Services, Inc.*, 314 F.3d 1031
2  (9th Cir. 2002)(applying 4-level enhancement because individual led five or more people
3  to violate the Clean Air Act); *United States v. Chau*, 293 F.3d 96 (3d Cir. 2002)(applying
4  § 3B1.1(c) (2-level enhancement) because defendant controlled the actions of two, not
5  five, other individuals who illegally removed or disposed of asbestos); *United States v.*
6  *Russo*, 281 F.App'x 43 (2d Cir. 2008)(upholding 4-level enhancement in Clean Air Act
7  case and finding that defendant was more than a "mere supervisor" as the defense argued
8  in that he was an equal partner with the other co-conspirator, hired laborors to perform
9  unlawful asbestos abatements and exercised control over them, and even acted on his own
10  to organize one of the unlawful abatements).

11  The application also applies because Guinn was not only a leader or organizer, but
12  the criminal activity involved five or more participants or was otherwise extensive.  As to
13  the former, there were at least five participants who dumped on either direct orders from
14  Guinn or on indirect orders from Guinn that came through their captain:  Jeff Hedlund,
15  Ken Black, Brian Cosgrove, Dane Backman, Larry Barela, and Corey Buckhalter.  There
16  was also Zachary Hedlund who testified to dumping at least one fully loaded barge in
17  November 2005 and also dumped other full and partially loaded barges.  He stated that
18  Guinn never told him to stop dumping.  The illegal conduct here was also extensive,
19  spanning at least 4 years of continuous dumping of millions of gallons of contaminated
20  spoils into an estuary of the San Francisco Bay.

21  **4.    Decrease for Acceptance of Responsibility**

22  The defense has asked Probation for a 2-level or 1-level reduction based on the
23  defendant's acceptance of responsibility.  The government objects to such a request.
24  Guinn forced the government to go to trial and prove its case, as every defendant has the
25  right to do.  In so doing, however, the defendant loses the ability to argue for acceptance
26  unless there are rare circumstances, which are not present here.  For example, Guinn did
27  not go to trial to assert or preserve issues that do not relate to factual guilt.  *See* U.S.S.G.
28  §3E1.1. App. Note. 2.  To this date, Guinn has never accepted responsibility in front of

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                     9

this Court for his wrongful actions.  He is not deserving now, post-conviction, of any acceptance.

The defense has argued to Probation that such a departure is warranted in light of the results of the trial, specifically, that there was an acquittal of one count and a mistrial on another count.  This result provides no bases for a departure.  *See* U.S.S.G. §3E1.1. Moreover, Guinn was convicted of Count 1, the conspiracy count, which means that the jury agreed that Guinn had conspired with others from at least April 2003 through January 2007 to violate the Clean Water Act.  In other words, the jury convicted Guinn of the full scope of the government's case, that he conspired with others to dump contaminated dredged spoils into the Bay without a permit for several years.  Guinn never accepted responsibility for any of this conduct pre-conviction.

**C. Government's Sentencing Recommendation**

Under the government's reading of the Sentencing Guidelines and applicable case law, the final Guidelines calculation is offense level 20.  Guinn has no criminal history, aside from an old misdemeanor conviction for disorderly conduct.  Thus, the applicable Guideline range is 33-41 months.  For the reasons set forth below, the government is recommending the Court impose the low end of the Guideline range and impose a sentence of 33 months.

As noted above, the Sentencing Guidelines have contemplated this type of offense and generated a Guidelines range that adequately addresses the seriousness of this offense.  The offense here is particularly egregious because of the length of time that dumping occurred (at least 2003 - 2007), the volume of dredged spoils dumped (millions of gallons), the nature of the dredged spoils (all toxic and/or contaminated), the location of the dumping (a highly sensitive estuary), and the intentional nature of the misconduct (knowing it was wrong and continuing to do it, as opposed to one-time negligent conduct).  Guinn's actions showed not only a complete disregard for the environment, but also a disregard for his employees, placing each of them in a situation where not only were they polluting the environment, but in so doing, they faced the loss of their license

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                           10

1  and personal liberties if prosecuted.

2  Sentencing Guinn within this Guideline range adequately reflects the seriousness
3  of the offense.  At trial, the government called Brian Ross, who is a life scientist with
4  USEPA and head of the Dredge and Sediment Management Team for USEPA which
5  coordinates with all relevant agencies in issuing dredging permits in the Bay Area.  At
6  trial, he testified, among other things, that dredging is one of the top five stresses on the
7  San Francisco Bay, and, as such, dredging operations are highly regulated to ensure
8  minimum impact to water quality.  He further testified that there are two kinds of dredged
9  spoils – Suitable for Aquatic Disposal ("SUAD") and Not-Suitable for Aquatic Disposal
10 ("NUAD").  He testified that 97% of dredged spoils are SUAD, which means they can be
11 disposed of in the water, but only at designated areas.  He further testified that millions of
12 dollars has been spent researching appropriate designated areas where SUAD could be
13 disposed both in the ocean and in the Bay given potential impacts.  All of this just to
14 dispose of clean dredged spoils.  Ross also testified that there are no designated areas near
15 Winter Island for the disposal of SUAD.

16 Ross then testified that, on average, 3% of dredged spoils is found to be NUAD,
17 and must be disposed of on land, not in water, because it is too contaminated and/or
18 toxic.[3]  Ross was familiar with all of the dredging projects that formed the basis of the
19 charges.  He testified that <u>all</u> of the illegal dumping that Guinn either did himself or
20 ordered others to do involved NUAD dredged spoils – not SUAD.  The distinction is
21 critical as it reflects the seriousness of the offense conduct.  Guinn did not just participate
22 and order illegal discharges of SUAD dredged spoils into the Bay, which would have
23 been an illegal act as well and worthy of federal prosecution.  Guinn ordered the illegal
24 dumping of toxic and/or contaminated dredged spoils into the Bay – the 3% NUAD that is

---

[3]  He defined "contaminated" as well as "toxic."  Generally, when something is contaminated, it contains contaminants (often hydrocarbon-based contamination here) that settles into the marine animal and can have negative impacts, including bioaccumulation, which means the contaminants work their way up the food chain, ultimately to humans.  He defined "toxic" as dredged material with a toxicity level that kills certain marine life.

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                     11

1  so contaminated that it cannot come into contact with water. Moreover, as Ross testified,
2  the area where the dumping occurred – around Winter Island – is an estuary where salt
3  water from the ocean meets fresh water from the Delta. As Ross testified, estuaries have
4  incredible biological significance, and, the estuary here is teeming with marine life,
5  including threatened and endangered species. Thus, Guinn not only dumped and ordered
6  the dumping of contaminated dredged spoils into the Bay on a routine basis, he ordered
7  the dumping to occur in one of the most highly sensitive areas in the Bay.

8        A sentence of thirty-three months imprisonment also ensures that there is
9  consistent and uniform enforcement both locally and across the nation of similar cases.
10 *See* § 3553(a)(6) (need to avoid unwarranted sentence disparities among defendants with
11 similar records who have been found guilty of similar conduct). In a 1993 case, Judge
12 Armstrong sentenced two defendants to significant prison terms for similar illegal
13 conduct that occurred in the San Francisco Bay. In *United States v. Donco Industries*, CR
14 92 407 SBA, (N.D.C.A. 1993), the defendants pled guilty to two felony CWA counts for
15 illegal dredging and fill activity in the San Francisco Bay. The president/CEO received a
16 24 month sentence, $5,000 fine, and 100 hours of community service. The CFO received
17 a 6 month sentence, $2,000 fine, and 50 hours community service. This dredging case
18 produced significant prison sentences even though it was prosecuted 17 years ago, when
19 environmental crimes were arguably not given the same consideration as other serious
20 crimes.

21       There are numerous other more recent Clean Water Act cases where the
22 defendants received significant sentences. *See e.g., United States v. Dand Van Dyke*, No.
23 03-CR-00033 (N.D. ind. 2003)(defendant sentenced to 46 months for CWA violations
24 stemming from illegal discharges of diesel fuel and sewage sludge from a wastewater
25 treatment facility); *United States v. Alexander Lapteff*, No. 03-CR-78 W.D. Va.
26 2003)(defendant sentenced to 36 months for negligently failing to operate wastewater
27 treatment facility and making false entries); *United States v. Derek Hagerman*, No. IP 06-
28 CR -0139 (S.D. Ind. 2007)(defendant sentenced to 60 months after jury convicted on ten

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]       12

1  CWA falsification counts based on 11 months of illegal discharges from a wastewater
2  treatment facility); *United States v. Prime Plating*, No. 04-CR-208 (D.Minn.
3  2006)(president of company sentenced to 30 months and company's environmental
4  manager sentenced to 26 months for discharging untreated hazardous waste into the sewer
5  system for one month);  *United States v. Lynn Moses*, (D. Idaho 2006)(defendant
6  sentenced to 18 months, $9,000 fine and had to issue a public apology for streamed
7  diversion resulting from development); *United States v. Weitzenhoff*, 35 F.3d 1275 (9th
8  Cir. 1993)(one defendant sentenced to 33 months and other defendant sentenced to 21
9  months for discharging sludge from a sewage treatment plant into the ocean on 40
10 occasions between April 1988 and June 1989); *United States v. Cooper*, 482 F.3d 658 (4th
11 Cir. 2007)(owner of trailer park sentenced to 27 months and $270,000 fine for
12 discharging sewer into creek).   These cases show that Clean Water Act violations are
13 serious crimes that merit prison sentences that properly reflect the seriousness of the
14 offense and provide for proper deterrence.  *See* §3553(a)(2).
15         A significant sentence is also needed in this case to promote respect for the law,
16 to protect the public from further crimes of this particular defendant, and to deter others
17 from committing similar crimes.  §3553(a)(2)(A), (B) & (C).  The message sent to the
18 business community when there is a criminal environmental prosecution that results in
19 significant prison time of an individual is strong.  The deterrence is real and effective and can
20 change the behavior of others similarly situated.  Ethan H. Jessup, *Environmental Crimes and*
21 *Corporate Liability: The Evolution of the Prosecution of "Green" Crimes by Corporate Entities*,
22 33 New England Law Review, Vol. 721, 733-34 (1999).   Such deterrence is of great significance
23 here where we saw a general manager decide to cut corners and enlist his subordinates to help cut
24 corners to ensure the continued business of Dutra and continued profitability of Brusco.  Guinn's
25 role in this offense warrants a thirty-three month sentence.  Not only must Guinn be held
26 accountable and learn that if you cut corners to ensure profitability, you will face a significant
27 prison sentence, but other managers around the Bay Area must also learn that it is not worth the
28 risk to pollute for profits because severe prison time will ensue if you are caught.  A significant

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                            13

prison sentence here will send a strong message to the Bay Area community that Clean Water Act violations are taken seriously and that violations of such laws will result in the loss of personal liberty for a significant amount of time. See §3553(a)(2)(B).

The government recognizes that a thirty-three month sentence is significant. The government also recognizes that Guinn is to blame for the sentence he is facing. He orchestrated and carried out a conspiracy to violate the Clean Water Act over the course of several years. He made the choice to break the law to satisfy the continued demands of a customer and he got caught. He must now be held accountable for the bad choices he made over and over again, even when his employees told him dumping was wrong, that they did not want to do it, and that it should stop. He must be held accountable for using his power as a manager to get his unwilling subordinates to help him carry out these wrongful acts, placing them at risk as well. He must be held accountable for polluting our sensitive Bay with millions of gallons of contaminated dredged spoils over the course of several years.

## IV. CONCLUSION

For all of the foregoing reasons, the government recommends a sentence of thirty-three months imprisonment followed by three years of supervised release. As to a fine, the government concurs with Probation that in light of his financial situation, his family situation, and possibly lengthy prison sentence, that the fine be waived and instead Guinn perform 200 hours of community service upon his release that is related to the environment. As to restitution, like most environmental crimes involving continuous discharges that are not detected for years, it is not possible to identify and quantify the damage that Guinn's actions may have wreaked on the San Francisco Bay. Such restitution can only be realized through continued prosecutions, stiff jail sentences and fines where appropriate, and greater awareness that environmental crimes are being enforced.

///

///

| | |
|---|---|
| 1  DATED: August 20, 2010 | Respectfully Submitted,<br>MELINDA HAAG |
| 2 | United States Attorney |
| 3 | |
| 4 | /s/ Stacey P. Geis<br>STACEY P. GEIS<br>Assistant United States Attorney |

UNITED STATES'
SENTENCING MEMORANDUM
[CR 09-0414 SI]                    15